**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED TRANSPORTATION UNION,
GENERAL COMMITTEE OF
ADJUSTMENT GO-386, J.D.
Fitzgerald, General Chairman,
    *Plaintiff-Appellant,*

   v.

BURLINGTON NORTHERN SANTA FE
RAILROAD COMPANY and LONGVIEW
SWITCHING COMPANY,
    *Defendants-Appellees.*

No. 07-35066

D.C. No.
CV-06-5441-RBL

OPINION

Appeal from the United States District Court
for the Western District of Washington
Ronald B. Leighton, District Judge, Presiding

Argued and Submitted
April 11, 2008—Seattle, Washington

Filed June 9, 2008

Before: Carlos T. Bea and Milan D. Smith, Jr.,
Circuit Judges, and Joseph M. Hood*, Senior District Judge.

Opinion by Judge Hood

---

*The Honorable Joseph M. Hood, Senior United States District Judge
for the Eastern District of Kentucky, sitting by designation.

6551

## COUNSEL

David S. Straton, Eugene, Oregon; David J. Hollander, Hollander, Lebenbaum & Gannicott, Portland, Oregon for the plaintiff-appellant.

Donald J. Munro, Goodwin Procter LLP, Washington, DC, for the defendants-appellees.

## OPINION

HOOD, Senior District Judge:

In its Complaint, Plaintiff-Appellant United Transportation Union, General Committee of Adjustment GO-386 ("Union") alleged that Defendants-Appellees Burlington Northern Santa Fe Railroad Company ("BNSF") and Longview Switching Company ("LSC") violated the Railway Labor Act ("RLA"), 45 U.S.C. § 151, *et seq.*, by implementing a trackage rights agreement approved through the process prescribed by the Interstate Commerce Act (hereinafter, "ICA"), 49 U.S.C. § 10101, *et seq.*, without bargaining with the Union. The Union objected to the unilateral transfer of certain work to employees of LSC and the cancellation of BNSF jobs, which effected a change in the "terms and conditions of employment" of individuals represented by the Union. In the present appeal, the Union challenges the district court's grant of BNSF and LSC's motion to dismiss on grounds that the court lacked subject matter jurisdiction. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## I. BACKGROUND

LSC is a Class III rail carrier, jointly owned by BNSF and another, non-party railroad, Union Pacific ("UP"). BNSF and

UP are Class I rail carriers. LSC has a separate corporate structure, its own employees, and distinct labor agreements from BNSF. The Union represents conductors and other operating employees (except engineers) of all three railroads.

Longview and Longview Junction are railyards that are part of a joint facility owned by BNSF and UP. Longview Junction is adjacent to the BNSF main line from Seattle to Vancouver. Longview is approximately ½ mile from Longview Junction and serves various industry customers. Historically, three companies performed switching operations at Longview Junction: LSC, BNSF, and UP. This arrangement created substantial operational inefficiencies because BNSF and UP were forced to take turns doing switching in the Longview Junction yard. One company switched its own cars for approximately twelve hours before giving way to the other for the next twelve hours. LSC also took turns doing its own switching. While one railroad switched its cars, the others remained idle. Ultimately, rail traffic was slowed throughout the region because of the delays which resulted, and the freight traffic of BNSF and UP, as well as Amtrak's passenger service, were affected.

On May 30, 2006, BNSF, LSC, and UP entered into an Overhead Trackage Rights Agreement ("Trackage Rights Agreement") which allowed LSC to perform all switching in the yard, eliminated the system of "taking turns," and reduced or eliminated "work events" on the main line.[1] On June 6, 2006, LSC filed a Verified Notice of Exemption with the Surface Transportation Board ("STB") pursuant to 49 C.F.R. § 1180.2(d)(7). The parties attached a copy of the Agreement and stated that BNSF and LSC were agreeable to the imposi-

---

[1]The result was increased fluidity of rail traffic for all users of the track. In implementing the Agreement, BNSF did away with one position that had previously handled some of the switching for the railroad, but no employees were furloughed as a result of the change. All affected individuals were assigned to other work. LSC added one switching job.

tion of the STB's standard labor protective conditions for trackage rights agreements. The STB issued an order acknowledging the Exemption on June 26, 2006, and providing that, "[a]s a condition to this exemption, any employees affected by the trackage rights will be protected by the conditions imposed in *Norfolk & Western Ry. Co. — Trackage Rights — BN*, 354 L.C.C. 605 (1978), [modified,] 360 I.C.C. 653 (1980)."

On June 29, 2006, the Union filed a petition to stay the exemption with the STB. BNSF filed an objection. The STB denied the petition for stay on June 30, 2006. While the STB noted the Union's argument that STB authorization was not necessary or appropriate because LSC was merely going to perform switching operations, the STB disagreed and held that "[b]ased on the evidence presented, it appears that the transaction at issue does require Board authorization." The STB noted that the Union could seek further relief by virtue of a petition to reject or revoke the notice of exemption. There is no record that the Union filed a petition to reject or revoke the exemption. Neither is there a record that the Union filed an action in the Court of Appeals to enjoin or suspend the STB's order denying the stay. Finally, there is no record that the Union invoked the arbitration procedures available under the labor conditions imposed by the STB. Instead, the Union filed the present suit in the Western District of Washington seeking declaratory and injunctive relief.

## II.   STANDARD OF REVIEW

"The district court's factual findings relevant to its determination of subject matter jurisdiction are reviewed for clear error." *Ass'n of Flight Attendants v. Horizon Air Indus., Inc.*, 280 F.3d 901, 904 (9th Cir. 2002), citing *La Reunion Française SA v. Barnes*, 247 F.3d 1022, 1024 (9th Cir. 2001). The district court's conclusions of law relevant to dismissal for lack of subject matter jurisdiction are reviewed de novo. *Id.*

## III.   DISCUSSION

### A.   Statutory Framework

The jurisdictional question in this case hinges on the relationship between the Interstate Commerce Act ("ICA"), 49 U.S.C. § 11301 *et seq.*,[2] and the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.* The former promotes railroad consolidation to create a more efficient system of interstate rail transportation. *See Norfolk & W. Ry. Co. v. Am. Train Dispatchers' Ass'n*, 499 U.S. 117, 119-20 (1991) ("*Dispatchers*"). The ICA grants the STB exclusive authority to approve or exempt from the standard approval process a variety of transactions involving rail carriers. 49 U.S.C. § 11323. An approved or exempted transaction may be carried out "without the approval of a State authority" and is "exempt from the antitrust laws and from all other law, including State and municipal law, as necessary" to let the involved carriers execute the transaction. 49 U.S.C. § 11321(a). However, the STB must still "impose labor protective conditions on the transaction to safeguard the interests of adversely affected railroad employees." *Dispatchers*, 499 U.S. at 120; *see also* 49 U.S.C. §§ 11326(a) & 10502(g).

The RLA, by contrast, aims "to encourage collective bargaining by railroads and their employees in order to prevent, if possible, wasteful strikes and interruptions of interstate

---

[2]The ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803, abolished the Interstate Commerce Commission ("ICC") (§ 101, 109 Stat. at 804) and transferred its remaining functions to the Surface Transportation Board ("STB") as of January 1, 1996. The Act also resulted in the renumbering of various provisions of the Interstate Commerce Act. 49 U.S.C. § 10505 became § 10502. Section 11341 became § 11321. Sections 11344 and 11345 became §§ 11323 and 11324, respectively. Section 11347 became § 11326. The new sections were enacted without substantive change. We refer to the current section numbering in this opinion and substitute the new numbers where the case law or administrative material refers to the former numbering system.

commerce." *Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union*, 396 U.S. 142, 148 (1969). "To this end, the RLA establishes elaborate procedures for the negotiation, enforcement, and modification of collective bargaining agreements between railroad carriers and labor unions." *Union R.R. Co. v. United Steelworkers of Am.*, 242 F.3d 458, 463 (3d Cir. 2001). "[T]he procedures of the Act are purposely long and drawn out, based on the hope that reason and practical considerations will provide in time an agreement that resolves the dispute." *Bhd. of Ry. & Steamship Clerks, etc. v. Fla. E. Coast Ry. Co.*, 384 U.S. 238, 246 (1966).

The question of whether a labor dispute is governed by STB procedures or by the RLA has important implications. Rail carriers generally prefer the streamlined STB procedures under the ICA because they reduce delay and facilitate the implementation of transactions. *See Norfolk & W. Ry. Co. v. Bhd. of R.R. Signalmen*, 164 F.3d 847, 852 (4th Cir. 1998). Unions tend to prefer the RLA because its negotiation procedures generate substantial delay and thereby increase employee leverage at the bargaining table. *Id.* The interplay between these statutory schemes also affects federal jurisdiction. Under the ICA, federal courts of appeals have "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all rules, regulations, or final orders of the [STB]." 28 U.S.C. § 2342(5); *see also* 28 U.S.C. § 2321(a). By contrast, at least where the RLA alone applies, a plaintiff may file suit in federal district court under 28 U.S.C. § 1331. *See, e.g.*, *Ass'n of Flight Attendants, AFL-CIO v. USAir, Inc.*, 960 F.2d 345, 347 (3d Cir. 1992).

With this background in mind, we proceed to the question at hand: whether the ICA required the district court to dismiss the union's action under the RLA for lack of subject matter jurisdiction. For the reasons set forth below, we hold that the ICA deprived the district court of jurisdiction, and therefore affirm.

1.  LSC's acquisition of trackage rights is an exempt transaction under 49 U.S.C. § 10502(a).

The first step in the analysis is to characterize the trackage rights agreement under the ICA. The parties do not dispute that the agreement is an exempt transaction. Reading 49 U.S.C. § 10502(a) and 49 C.F.R. § 1180.2(d)(7) together confirms that their understanding is correct.

**[1]** Section 10502(a) provides that the STB "shall exempt a transaction whenever the Board finds that the application (1) is not necessary to carry out the transportation policy of section 10101, and (2) either the transaction is of limited scope or the application is not needed to protect shippers from the abuse of market power." 49 C.F.R. § 1180.2(d)(7) in turn provides that "[a]cquisition of trackage rights and renewal of trackage rights by a rail carrier over lines owned or operated by any other rail carrier or carriers" are exempt transactions under § 10502 if they are "(1) based on written agreements, and (2) not filed or sought in responsive applications in rail consolidation proceedings." The statutory exemption provided by § 10502(a) applies because the regulatory requirements of § 1180.2(d)(7) have been satisfied. The parties do not dispute that LSC is an "other rail carrier." The trackage rights agreement, moreover, was "based on written agreement" and "not filed or sought in responsive applications in rail consolidation proceedings." 49 C.F.R. § 1180.2(d)(7).

2.  49 U.S.C. § 11321(a) applies to a transaction made exempt by 49 U.S.C. § 10502(a).

**[2]** One result of the exemption under 49 U.S.C. § 10502(a) and 49 C.F.R. § 1180.2(d)(7) is that the carriers can implement their transaction without obtaining prior approval and authorization from the STB under 49 U.S.C. § 11323(a)(6). *See* 49 C.F.R. § 1180.2. More importantly to this case, however, the exemption under § 10502(a) triggers the application of 49 U.S.C. § 11321(a).

**[3]** Section 11321(a) permits carriers whose transaction has been "approved or exempted by the Board under this subchapter" to carry out the transaction "without the approval of a State authority." 49 U.S.C. § 11321(a) (referring to Title 49, Chapter 113, Subchapter II). For the designated exempt transaction, the statute also grants an exemption "from the antitrust laws and from all other law, including State and municipal law, as necessary to let [the parties] carry out the transaction." *Id.* "The authority of the Board under this subchapter is exclusive." *Id.* The purpose of § 11321 immunity is to ensure that, once the interests of affected employees are accommodated to the greatest extent possible, obligations imposed by laws such as the Railway Labor Act will not prevent carriers from creating a more efficient market in rail transportation. *See Dispatchers*, 499 U.S. at 133.

Citing *Railroad Consolidation Procedures—Trackage Rights Exemption, Ex Parte No. 282*, 1 I.C.C. 270 (1985), the Union argues that § 11321(a) does not apply because the trackage rights agreement was not "exempted by the Board under this subchapter." 49 U.S.C. § 11321(a). *Railroad Consolidation Procedures* interpreted the quoted text as referring to exemptions that *originate* in what is now Title 49, Chapter 113, Subchapter II. *See* 1 I.C.C. at 279. Because LSC's exemption had its source in § 10502 and § 10502 is instead located in Chapter 105, the Union reasons, § 11321(a) does not apply on its terms.

**[4]** We reject the Union's interpretation because none of the statutes contained in Subchapter II of Chapter 113 authorizes the STB to exempt a transaction. Section 11321(a) is the only statute in Subchapter II that even mentions exemptions, and the exemptions that may issue under that statute are neither issued "by the Board" nor applicable to "transactions." Instead, § 11321(a) exemptions issue automatically upon satisfaction of the statutory requirements and apply to carriers rather than the transactions in which they may be involved. *Compare* 49 U.S.C. § 11321(a) ("A rail carrier . . . participat-

ing in . . . a *transaction* . . . exempted *by the Board* under this subchapter may carry out the transaction . . . without the approval of a State authority.") (emphasis added) *with id.* ("A *rail carrier . . . is exempt* from the antitrust laws and from all other law . . . .") (emphasis added); *see also Bhd. of Locomotive Engr's v. Boston & Maine Corp.*, 788 F.2d 794, 801 (1st Cir. 1986) ("[T]he [antitrust and other law] exemption provision [in § 11321(a)] . . . is self-executing."). The Union's interpretation is thus at odds with the text of Subchapter II. *See* 49 U.S.C. §§ 11321-11328.

**[5]** The more reasonable construction of "exempted by the Board under this subchapter" is that § 11321(a) immunity applies if the result of a Board exemption that originates anywhere in the statutory scheme is that a carrier need not comply with a requirement imposed in Subchapter II. This is the construction most recently adopted by the ICC in *Rio Grande Industries, Inc.—Trackage Rights—Burlington Northern Railroad Co.*, I.C.C. Finance Docket No. 31730, 1991 WL 62169, at *3-4 (Mar. 8, 1991), which clarified *Rail Consolidation Procedures* and explained that the exemption authority in § 10502 does not "remove transactions exempted from [§ 11323] from the reach of [§ 11321(a)]." *Id.* at *4; *see also Union R.R. Co.*, 242 F.3d at 466-67 & n.10 (holding that § 11321(a) applies to transactions exempted under § 10502 and noting the ICC's decision in *Rio Grande Industries*). Even if § 11321(a) did not unambiguously compel this interpretation, we would be required to follow it as the ICC's reasonable interpretation of the statute. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).

**[6]** We therefore hold that the trackage rights agreement between BNSF, LSC, and UP was "exempted by the Board under [Chapter 113, Subchapter II]" because, even though the statutory source of the transaction's exemption was § 10502, the effect of the exemption was that the carriers did not have to comply with the approval requirements of § 11323, and § 11323 is located in Subchapter II of Chapter 113. The carri-

ers' trackage rights agreement could therefore be carried out "without the approval of a State authority." 49 U.S.C. § 11321(a). The transaction was also "exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let [the] rail carrier[s] . . . carry out the transaction." *Id.*

    3.   The STB's exclusive authority under § 11321(a) deprives the district court of jurisdiction.

**[7]** Finally, we conclude that the application of § 11321(a) deprived the district court of subject matter jurisdiction over the Union's RLA claims. Section 11321(a) makes the "authority of the Board under [Chapter 113, Subchapter II] . . . exclusive." 49 U.S.C. § 11321(a). In *Railway Labor Executives Association v. Southern Pacific Transportation Company*, 7 F.3d 902, 906 (9th Cir. 1993), we interpreted this language to mean that the "ICC has exclusive authority to resolve" a challenge to a transaction immunized under the statute. We also held that § 11321(a) immunity applies against claims brought under the RLA. *Id.* Because the union in that case had filed an RLA claim challenging a merger to which § 11321(a) applied, it followed that the district court lacked subject matter jurisdiction. *Id. Railway Labor Executives* compels the same outcome here. *See also Norfolk & W. Ry. Co. v. Bhd. of R.R. Signalmen*, 164 F.3d 847, 854-55 (4th Cir. 1998) (taking a similar approach); *Bhd. Ry. Carmen, Div. of Transp. Commc'ns Int'l Union v. CSX Transp., Inc.*, 855 F.2d 745, 748-49 (11th Cir. 1988) (same); *Boston & Maine Corp.*, 788 F.2d at 800-01 (same).

**[8]** The Trackage Rights Agreement in this matter is a regulated Subchapter II transaction under 49 U.S.C. § 11323(a) and 49 C.F.R. § 1180.2. The parties to that transaction filed a Notice of Exemption, expressly referencing § 1180.2(d)(7). The STB granted the exemption from the procedures otherwise required under 49 U.S.C. §§ 11323 and 11324, filing its notice under 49 C.F.R. § 1180.2(d)(7) and imposing *Norfolk*

*& Western* conditions. As a regulated Subchapter II transaction, the transaction is, thus, subject to 49 U.S.C. § 11321(a) and immune from "all other law," including the abrogation of collective bargaining agreements and the strictures of the RLA as necessary to implement the transaction. *Dispatchers*, 499 U.S. at 131; *Union R.R.*, 242 F.3d at 463-64. Any disputes, including labor disputes, necessary to the Trackage Rights Agreement and its implementation and any disputes about whether modifications to the collective bargaining agreements are "necessary" to the transaction are within the exclusive jurisdiction of the STB, not the federal courts, and should be raised there. 49 U.S.C. § 11323(a); *Southern Pacific*, 7 F.3d at 906-07.

[9] We conclude that the district court properly dismissed this matter, having determined that it did not have subject matter jurisdiction.

**AFFIRMED**.