**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 2, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

| | |
|---|---|
| BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES DIVISION, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, and BROTHERHOOD OF RAILROAD SIGNALMEN,<br><br>Plaintiffs-Appellants,<br><br>v.<br><br>BURLINGTON NORTHERN SANTA FE RAILWAY COMPANY, and GARY GIRON, in his capacity as Secretary-Designee, New Mexico Department of Transportation,<br><br>Defendants-Appellees. | No. 08-2232 |

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. CIV-06-245-JCH)**

---

John O'B. Clarke, Jr., Highsaw, Mahoney & Clarke, P.C., Washington, District of Columbia, for Appellants BMWED and BRS.

David M. Pryor, BNSF Railway Company, Fort Worth, Texas (Donald J. Munro, Goodwin Proctor LLP, Washington, District of Columbia, and John R. Conney and Earl E. DeBrine, Jr., Modrall Sperling Roehl Harris & Sisk, P.A., Albuquerque, New Mexico, with him on the brief), for Appellee BNSF Railway Company, and Gail Gottlieb (Mark Chaiken and Kerry Kiernan with her on the brief), Sutin, Thayer & Browne, P.C., Albuquerque, New Mexico, for Appellee Secretary-Designee Gary Giron.

Before **TACHA**, **TYMKOVICH**, and **GORSUCH**, Circuit Judges.

**TYMKOVICH**, Circuit Judge.

This case arises from Burlington Northern Santa Fe Railway Company's (BNSF) proposed sale of approximately 290 miles of BNSF's rail line to the New Mexico Department of Transportation. New Mexico sought to obtain the rail line as part of a plan to provide commuter rail service between Albuquerque, Santa Fe, and other points within the state. Under the terms of sale, New Mexico would obtain ownership of BNSF's rail lines, but reserve to BNSF a concurrent freight easement on the lines. New Mexico would also take over maintenance responsibilities of the right-of-way, an obligation previously belonging to BNSF.

In an effort to prevent New Mexico from assuming the maintenance responsibilities, two union organizations representing rail workers who had previously performed the maintenance work sued. They contended the assignment of the maintenance obligations (1) violated § 2 Seventh of the Railway Labor Act (RLA), 45 U.S.C. § 151 *et seq.*; and (2) breached the collective bargaining agreement between the workers and BNSF.

The district court dismissed the action, concluding it lacked jurisdiction over the claims. It held the RLA vests exclusive jurisdiction over the workers'

claims in the National Railroad Adjustment Board, which has yet to review the case.

We agree with the district court. As explained below, we find the RLA reserves the dispute in this case to the Adjustment Board in the first instance, thus depriving the district court of jurisdiction. The workers' remedy lies in the administrative process before the Adjustment Board.

Accordingly, we AFFIRM the district court's dismissal of the complaint.

## I. Background

*The Transaction.* As part of a project to expand public commuter rail service in central New Mexico, the New Mexico Department of Transportation entered into several agreements to purchase a portion of a rail line from BNSF. Under the proposed agreements, BNSF would transfer fee simple ownership in the physical assets of the rail lines to the state.

As part of the transaction, BNSF reserved an exclusive freight easement over the tracks. The easement, among other things, "reserve[d] for [BNSF] and its successors and assigns an exclusive easement for freight railroad purposes, including but not limited to, the construction, maintenance, repair, replacement and operation of freight rail and associated facilities." App. at 250. The parties' respective management obligations were set forth in a Joint Use Agreement (JUA). Specifically, the JUA provided that New Mexico "will be responsible for

the management and maintenance of the Rail Corridor, subject to BNSF's

Retained Freight Easement." App. at 225–26.[1]

*Statutory Provisions.* BNSF and New Mexico structured the transaction to

ensure New Mexico would not acquire any obligation to provide freight common

carrier service under the Interstate Commerce Act (ICA), 49 U.S.C. § 101 *et seq.*

The ICA subjects common carriers to the jurisdiction of the Surface

Transportation Board (STB), which imposes a comprehensive scheme of

regulations on rail carriers.

As relevant here, the ICA provides that the sale of active rail lines is

subject to the STB's prior approval. *See* 49 U.S.C. § 10901. In particular, the

acquisition of an active rail line and the corresponding transfer of common carrier

obligations ordinarily requires prior STB approval, even if the acquiring entity is

not presently a common carrier. *See Dept. of Transp.—Acquisition and Operation*

*Exemption—Maine Cent. R.R. Co.*, 8 I.C.C. 2d 835, 836–37 (1991); *see also Cent.*

*Puget Sound Reg'l Transit Auth.—Acquisition Exemption—BNSF Ry. Co.*, Fin.

No. 34747, 2005 WL 3090144, at *2 (STB Nov. 18, 2005). The STB does not,

however, have prior approval authority over a transaction where no common

---

[1] The JUA also provided that New Mexico would charge BNSF for the rail company's proportionate share of maintenance costs for the portions of the rail line used by both parties. New Mexico would also inspect and maintain sidings, spurs, or industrial tracks not used for commuter service on the relevant segments. App. at 229.

carrier rights or obligations are being transferred. *Maine*, 8 I.C.C. 2d at 836–37; *see also Port of Seattle—Acquisition Exemption—Certain Assets of BNSF Ry. Co.,* Fin. No. 35128, 2008 WL 4718447, at *2 (STB Oct. 23, 2008).

*Regulatory Proceedings.* New Mexico initially filed notice of the proposed transaction with the STB. Later, the state sought dismissal of the agency proceedings since it would not become a common carrier as a result of the transaction and no agency action was therefore necessary. The STB agreed and dismissed the agency proceeding, declaring the "transaction does not require Board authorization" because "BNSF would not be transferring common carrier rights or obligations and . . . [New Mexico] would not hold itself out as a common carrier. . . . Under these circumstances, [New Mexico] would not become . . . subject to the Board's jurisdiction." App. at 151–52.

*District Court Action.* Once the STB stated it had no jurisdiction, the transaction was free to move forward. The rail workers then filed suit in federal district court, arguing that BNSF violated the RLA and the collective bargaining agreement between BNSF and the rail workers (CBA) in assigning the maintenance responsibility to New Mexico. The rail workers contended BNSF did not in fact *transfer* the maintenance obligations to New Mexico; rather, the rail company simply *contracted* that work to the state. The rail workers argue that as long as BNSF has the obligation to provide maintenance to the rail line, it may not, under the CBA, assign or contract that work to anyone other than union

employees. The workers maintained that by relinquishing the work to New Mexico, BNSF violated the terms of the CBA, as well as RLA provisions that prohibit unilateral changes in the pay rates, rules, or working conditions already set forth in collective bargaining agreements.[2] The rail workers sought (1) a declaratory judgment that BNSF, as the sole common carrier entity operating on the line, has a nondelegable obligation to maintain its right-of-way, (2) a declaratory judgment that BNSF violated the RLA by contracting the maintenance work to New Mexico, and (3) an injunction reforming the current transaction and preventing any future transactions violative of the RLA.

BNSF and New Mexico moved to dismiss the workers' complaint. The district court agreed, concluding it did not have jurisdiction and that under the RLA the National Railroad Adjustment Board governed the dispute. Accordingly, the district court dismissed the complaint with the understanding the dispute would be subject to binding arbitration proceedings before the Adjustment Board.

## II.  Analysis

On appeal, the rail workers argue the district court erred in concluding the Adjustment Board has exclusive jurisdiction over their claims. We review legal

---

[2]  Section 2, Seventh of the RLA, 45 U.S.C. § 152, Seventh, provides, "No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title." Thus, any violation of § 2, Seventh assumes a violation of an already existing agreement.

questions involving a district court's subject matter jurisdiction de novo. *See Bhd. of Maint. of Way Employees Div./IBT v. Union Pac. R.R. Co.,* 460 F.3d 1277, 1282 (10th Cir. 2006). We agree with the district court that it lacked subject matter jurisdiction because the RLA reserves cases such as this for binding arbitration before the Adjustment Board.

### A. *Legal Framework for Resolving RLA Disputes*

The RLA provides a comprehensive and mandatory framework for resolving labor disputes under collective bargaining agreements. *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994). It aims "to encourage collective bargaining by railroads and their employees in order to prevent, if possible, wasteful strikes and interruptions of interstate commerce." *United Transp. Union v. Burlington N. Santa Fe R.R. Co.*, 528 F.3d 674, 677–678 (9th Cir. 2008) (quoting *Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union*, 396 U.S. 142, 148 (1969)). "To this end, the RLA establishes elaborate procedures for the negotiation, enforcement, and modification of collective bargaining agreements between railroad carriers and labor unions." *Id.* at 678 (quoting *Union R.R. Co. v. United Steelworkers of Am.*, 242 F.3d 458, 463 (3d Cir. 2001)).

The RLA sets forth two provisions relevant to the workers' claims. The first is 45 U.S.C. § 152, Seventh ("§ 2, Seventh"). Under this provision, no carrier "shall change the rates of pay, rules, or working conditions of its

employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in § 6 of [the RLA]." Pursuant to § 6, 45 U.S.C. § 156, carriers must give notice of major changes to pay, rules, or working conditions and, if arbitration is requested, maintain the status quo ante during the proceedings. The rail workers contend BNSF breached the "scope of work" provisions contained in its collective bargaining agreement and thereby violated § 2, Seventh by improperly contracting the maintenance responsibilities on the rail lines to New Mexico.

RLA disputes can be resolved either in federal court or in the Adjustment Board through binding arbitration. To determine which forum is appropriate in the first instance, the Supreme Court has created a two-part classification system: If a dispute is "major," it is not subject to Adjustment Board arbitration and should be resolved in federal court. If a dispute is "minor," binding arbitration before the Adjustment Board is mandatory. This appeal requires us to determine whether the disagreement between the rail workers and BNSF qualifies as a major or minor dispute.

### B. Major and Minor Disputes

The RLA provides little guidance regarding how to determine whether a dispute is major or minor, but a series of well-established Supreme Court cases have laid out a framework for answering this question. *See Cons. Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299 (1989) ("*Conrail*"); *Norris*, 512 U.S.

at 252–57.  "Major disputes relate to the formation of collective [bargaining] agreements."  *Norris*, 512 U.S. at 252 (quotations omitted).  These disputes relate to contract formation and arise

> where there is no such agreement or where it is sought to change the terms of one, and therefore *the issue is not whether an existing agreement controls the controversy.* They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

*Conrail*, 491 U.S. at 302 (citation omitted) (emphasis added).  Thus, "major disputes seek to create contractual rights."  *Id.*

In contrast, "minor disputes" seek to "enforce [contractual rights]."  *Id.* They arise "out of the interpretation or application of" existing collective bargaining agreements.  *Id.* at 303 (quoting 45 U.S.C. § 153 First (i)).  Such disputes contemplate

> the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. *The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case.* In the latter event the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, e.g., claims on account of personal injuries. In either case the claim is to rights accrued, not merely to have new ones created for the future.

*Id.* (citation omitted) (emphasis added).

The Supreme Court has stressed that the relative importance of a case does not determine whether it qualifies as a major or minor dispute.  *Conrail*, 491 U.S.

at 305.  Rather, we look to "whether a claim has been made that the terms of an existing agreement either establish or refute the presence of a right to take the disputed action.  The distinguishing feature of such a case is that the dispute may be conclusively resolved by interpreting the existing agreement." *Id.*  To say "a minor dispute can be 'conclusively resolved' by interpreting the CBA is another way of saying that the dispute does not involve rights that exist independent of the CBA." *Norris*, 512 U.S. at 265.  The essence of the inquiry is whether the source of a party's asserted legal right is its collective bargaining agreement.

The Supreme Court has emphasized the primary importance of labor arbitration under the RLA.  To that end, the default position for courts is to deem a dispute as minor if it even remotely touches on the terms of the relevant collective bargaining agreement.  "[W]hen in doubt" the courts are to "construe disputes as minor." *Bhd. of Locomotive Eng'rs v. Atchison, Topeka & S. F. Ry. Co.*, 768 F.2d 914, 920 (7th Cir. 1985).  Indeed, a party bears a "relatively light burden" in establishing exclusive jurisdiction in the Adjustment Board under the RLA.  *Conrail*, 491 U.S. at 307.

To meet this burden, a party need only show that the contested action is "arguably justified" by the terms of the collective bargaining agreement.  *Conrail*, 491 U.S. at 304–05, 307, 310.  The Supreme Court declared,

> We hold that if an employer asserts a claim that the parties' agreement gives the employer the discretion to make a particular change in working conditions without prior negotiation, and if that

claim is *arguably justified* by the terms of the parties' agreement (i.e., the claim is neither obviously insubstantial or frivolous, nor made in bad faith), the employer may make the change and the courts must defer to the arbitral jurisdiction of the Board.

*Id.* at 310 (emphasis added).

The Court has identified a number of factors to consider in determining whether either party's claim is "arguably justified." We look first and primarily, of course, to both the express and implied provisions of the collective bargaining agreement. *Conrail*, 491 U.S. at 320 (holding a dispute was minor because it was "arguably justified by the implied terms of its collective-bargaining agreement"). Of equal importance is the parties' "practice, usage and custom" in negotiating and operating under applicable labor agreements. *Id.* at 311 ("[I]t is well established that the parties' 'practice, usage and custom' is of significance in interpreting their agreement.").

Other non-exclusive factors arising from cases applying *Conrail* include (1) arbitration decisions interpreting the bargaining agreement, (2) arbitration decisions interpreting similar language in other bargaining agreements, (3) the absence of a term prohibiting the carrier's action, (4) industry practice, (5) the intent behind and nature of the actions giving rise to the dispute, (6) any relevant amendments or side letters, and (7) unsuccessful attempts to "obtain through bargaining rights the carrier later contended it possessed." ABA, THE RAILWAY LABOR ACT, 389–93 (2d ed. 2005).

-11-

To some extent, courts acknowledge that the distinction between major and minor disputes can be a matter of artful pleading. *Conrail*, 491 U.S. at 305. "[T]here is a danger in leaving the characterization of the dispute solely in the hands of one party" when it "chooses whether to assert an existing contractual right to take or to resist the action in question." *Id.* Where the party "asserting a contractual basis for its claim is insincere in so doing, or its position [is] founded upon . . . insubstantial grounds, the result of honoring that party's characterization would be to undercut the prohibitions of § 2, Seventh, and § 6 of the Act against unilateral imposition of new contractual terms." *Id.* at 306 (quotations and citations omitted). In such a situation, "protection of the proper functioning of the statutory scheme requires the court to substitute its characterization for that of the claimant." *Id.*

In this case, there is no contention BNSF's defenses are frivolous or insincere, nor does the rail workers' pleading or BNSF's response prevent us from discerning the essence of the dispute.

## C.  The Dispute Here Is Minor

With these principles in mind, we turn to the claims in this case.  Under the lenient standards the Supreme Court has set forth, a dispute qualifies as minor when it is "arguably justified" by the express and implied terms of the collective bargaining agreement.  As we explain below, the district court correctly determined the contested action in this case—BNSF's contracting maintenance

-12-

responsibilities to New Mexico—was "arguably justified" under the CBA's scope of work provision.

*First*, the CBA supports BNSF's position. The CBA places no restrictions on the company's right to sell rail lines. Nor does the CBA explicitly establish that BNSF is obligated to continue using its employees to maintain lines BNSF has sold but over which it retains a freight easement and common carrier obligations. That the CBA's scope of work provisions obligate BNSF to assign work to its employees only if the company retains ownership of the property and control over the rail lines is arguable. "Contractual silence can be construed as a reservation to the employer of the right to act unilaterally." THE RAILWAY LABOR ACT, *supra* at 395. The tracks here were transferred in fee simple to New Mexico, and the JUA vested maintenance responsibility in the new owner.[3] Reviewing the CBA's reservation of work against these facts is a matter well suited for arbitration proceedings before the Adjustment Board.

*Second*, "practice, usage and custom," *Conrail*, 491 U.S. at 311, support the conclusion that BNSF's position is "arguably justified" by the CBA. *Cf. Air Line Pilots Ass'n, Int'l. v. Guilford Transp. Indus. Inc.*, 399 F.3d 89, 93 (1st Cir. 2005)

---

[3] In support of its flexibility under the CBA's scope of work provisions, BNSF also points out the CBA grants BNSF the unilateral right to abolish assignments and reduce the number of maintenance positions, so long as it provides requisite notice to the unions. This bolsters BNSF's claim that a reduction of maintenance obligations along the transferred track is not a violation of the CBA even if it retains residual rights under the easement.

("A dispute is considered minor whenever the challenged conduct is 'arguably justified' either by the text and negotiating history of the CBA or by the past practices of the parties."); *Bhd. of Ry. & Steamship Clerks v. Atchison, Topeka & S.F. Ry. Co.*, 847 F.2d 403, 406 (7th Cir. 1988) (finding the railroad produced sufficient evidence of past practice to render the dispute minor). The record shows, for example, that BNSF has previously sold properties to third parties and ceded its maintenance obligations.[4] For example, in the mid-1990s, BNSF sold a right-of-way to public agencies in California, retained an exclusive freight easement over the lines, but was no longer responsible for maintaining the track. App. at 89. BNSF also points to transactions where it has retained a freight easement and common carrier obligations, without retaining any obligation to maintain the property. App. at 97–98.[5]

*Third*, several arbitration decisions involving leased or sold railroad properties support BNSF's position. App. at 99–113. For example, BNSF points

---

[4] Whether these previous transactions bear on the interpretation of the CBA is a question for the Adjustment Board. For our purposes, it is enough that they arguably justify classifying the dispute as arising out of the CBA.

[5] *See Cent. Puget Sound*, 2005 WL 3090144, at *1–2 (Nov. 18, 2005) (dismissing a notice of exemption because BNSF was not transferring common carrier obligations to Sound Transit when, along with the purchase and sale agreements, Sound Transit entered into a joint use agreement with BNSF under which BNSF retained the exclusive common carrier obligation to provide freight service to all existing and new customers and retained responsibility for dispatching the commuter operations on the lines, while Sound Transit became responsible for maintenance activities).

to an Adjustment Board decision in which the union claimed the carrier improperly subcontracted repair work after leasing facilities to a local industry. App. at 102. The Adjustment Board ruled in the carrier's favor, noting "the work was done at the direction of the Lessee who initiated and completed the work." *Id.* The Adjustment Board found the carrier was not aware of the work, and the Lessee was free to contract out maintenance to whomever it chose. *Id.* The union, the Adjustment Board concluded, failed to show that the work belonged to its members. *Id.* In another decision with similar facts, BNSF leased railroad-owned facilities to General Motors, which then contracted the maintenance and construction work out to a third party. App. at 104. The union argued the arrangement violated the collective bargaining agreement's subcontracting rules, but the Adjustment Board ruled that because the facility was no longer part of BNSF's operation, the maintenance work no longer belonged to union employees. *Id.* at 106. The facilities were under GM's control, and GM could contract the work as it saw fit. *Id.* Other decisions have similarly held that control is the central issue, and that when the carrier does not have control over the work performed, because it either leased or sold the property, the carrier no longer has the obligation to perform the maintenance and to use union employees. App. at 108–113.[6]

---

[6] The workers here, of course, will be free to argue before the Adjustment
(continued...)

*Finally*, our conclusion accords with the decisions of other federal courts classifying disputes as minor under collective bargaining agreements. *See, e.g.*, *Sheet Metal Workers' Int'l. Ass'n v. Burlington N. R.R. Co.*, 893 F.2d 199, 203–205 (8th Cir. 1990) (whether the agreement permitted the railroad to use nonunion employees of a wholly owned subsidiary to maintain locomotives used by the railroad to generate electricity could *arguably* be resolved by the scope clause of the agreement between the union and railroad, and, therefore, this was a minor dispute, even though the railroad's argument that the agreement permitted its action might be wrong); *Gen. Comm. of Adjustment, United Transp. Union, W. Md. Ry. Co. v. CSX R.R. Corp.*, 893 F.2d 584, 592 (3d. Cir. 1990) (noting "several other courts have also categorized disputes involving rail line sales that caused the loss of union positions as minor under the RLA").

While none of the above factors is dispositive, they all arguably justify BNSF's explanation for its actions. The Adjustment Board will ultimately determine the strength of those explanations when it resolves whether or not BNSF breached the CBA.

\* \* \*

In sum, the dispute here meets *Conrail's* "arguably justified" standard. Under the CBA and in light of the relevant factors that guide our inquiry, BNSF

---

[6](...continued)
Board that the circumstances surrounding previous arbitration awards are distinct.

*arguably* had the authority to sell the rail lines at issue and to include in that sale the responsibility to maintain the lines—reducing union maintenance jobs—despite retaining a freight easement and common carrier obligations. BNSF's view of the CBA is sufficiently reasonable to meet its "relatively light burden" under *Conrail*. 491 U.S. at 307.

### D. The Rail Workers' Arguments

The rail workers make two arguments to avoid this conclusion, but neither is persuasive.

The first argument is that the RLA requires a "two-step inquiry." Aplt. Br. at 33. According to the rail workers, before we can decide whether BNSF breached the CBA, we must first resolve a threshold issue; namely, whether BNSF transferred the maintenance obligations to New Mexico when it sold the physical assets of the rail line. The rail workers claim the Adjustment Board will have to look at the line transfer transaction, the STB's decision regarding that transaction, and BNSF's obligations under the ICA. The rail workers argue the Adjustment Board has neither the jurisdiction nor the expertise to examine those matters, and thus this dispute cannot fall into the minor category. The rail workers aver that, with the additional threshold analysis, the case moves beyond merely interpreting the CBA and qualifies as a major dispute. We disagree.

First of all, the workers are correct that the Adjustment Board must determine whether BNSF actually transferred the maintenance obligations to New

Mexico when BNSF transferred the physical railroad line.[7]  The rail workers will

be entitled to show that BNSF retained control over maintenance obligations on

the freight easement.  To resolve that question, the Adjustment Board will have to

consider several issues, including an interpretation of the line-transfer documents

and the JUA, as well as the rail workers' contention that BNSF retained all the

rights and obligations of a freight common carrier under the ICA.

The rail workers argue that because the Adjustment Board cannot resolve

their main contention—that BNSF violated the CBA and thus the RLA—without

first addressing these issues, the case qualifies as a major dispute.  They reason

that the Adjustment Board will not interpret the terms of the CBA, a necessity for

a minor dispute, but will first answer the threshold question of whether the CBA

even applies.  Without citing any legal authority, the rail workers argue the

Adjustment Board does not have jurisdiction to review the ICA, the STB's

decision, or the sales documents in answering the threshold question, and that

even if it did, it is not equipped to do so.

The rail workers' arguments fail because they cannot rebut the undisputed

fact that the only source of their right to work is the CBA.  *See Norris*, 512 U.S.

---

[7]  If BNSF did transfer the maintenance obligations, then the company no
longer has any duty to perform the maintenance and thus no CBA obligation to
use union employees.  If, on the other hand, the rail workers show that BNSF
retained the maintenance obligations, they contend the CBA obligates the
company to use union employees for any maintenance work.

-18-

at 265. They have no claims that exist independent of it. That the Adjustment Board will have to consider issues related to both the interpretation of the CBA and its application does not change this fact. Naturally, the Adjustment Board will look to documents, cases, statutes, and past practices outside the four corners of the document to do that. In the end, the Adjustment Board must still determine whether BNSF violated the CBA. And the Adjustment Board is perfectly capable of reviewing whether BNSF actually divested itself of maintenance obligations, or whether the line-sale transaction was a subterfuge to evade the requirements of the CBA.[8]

Because the Adjustment Board will be doing nothing more than interpreting and applying the CBA to disputed facts, and because it has authority to do so, the district court properly characterized this case as a minor dispute. As the district court explained,

> Plaintiff alleges that its members have the contractual right to perform the maintenance work at issue. BNSF contends that Plaintiff's members have no right to perform work on track sold to a third party, and has plausible contractual justifications for its actions. This is the very essence of a minor dispute over which this Court has no jurisdiction. If a board of adjustment arbitrator examines the terms of the sale between BNSF and the State and finds that BNSF

---

[8] Our position is consistent with the Second Circuit in *Bhd. Locomotive Eng'rs Div. 269 v. Long Island R.R.*, 85 F.3d 35, 38 (2d Cir. 1996), where the court rejected a claim that the "conclusively resolved" language from *Conrail* or *Norris* created a "new, more demanding standard" for classifying minor disputes. Courts have been consistent in applying the "arguably justified" standard in categorizing disputes.

retained enough control over the right-of-way such that maintenance by the State would constitute illegal subcontracting, it can order BNSF to pay Plaintiff's claims until such time as Plaintiff is no longer being harmed by BNSF's contract violation. This would completely resolve Plaintiff's RLA claim.

App. at 340–41. This lucid reasoning explains the centrality of the CBA to this case.

We similarly dispose of the rail workers' second argument. They contend the dispute concerns the *application* of the CBA, and not its interpretation. The workers insist this creates a "hybrid" category that fits outside the minor classification. We again disagree.

As an initial matter, the RLA is clear no line exists between disputes that arise from the *application* of collective bargaining agreements and those that arise from their *interpretation*. In fact, the RLA applies plainly to collective bargaining agreement application claims as well as interpretation claims. *See, e.g.*, 45 U.S.C. § 153 First (i) (RLA applies to disputes arising from "the interpretation or application of agreements concerning rates of pay, rules, or working conditions"); *Bhd. of Maint. of Way Employees Div./IBT v. Union Pac. R.R. Co.*, 460 F.3d 1277, 1282 (10th Cir. 2006) (explaining minor disputes "relate[ ] either to the meaning or proper application of a particular provision" of a collective bargaining agreement) (citation omitted). While major disputes seek to create contractual rights, minor disputes seek to enforce them. *Id.* At base, a

minor dispute is one in which a party seeks to enforce *preexisting* contractual

rights. *Conrail*, 491 U.S. at 302.

Even if the text of the RLA were not clear enough, *Conrail* and subsequent

cases routinely apply the major/minor framework in these situations. The

Supreme Court, in fact, rejected a variation of the rail workers' argument in

*Conrail* and instead adopted an analysis that channels most cases into the minor

category. The major/minor framework is drawn from the traditional "vocabulary

of rail management and rail labor, as a shorthand method of describing two

classes of controversy." *Id.* It bears repeating:

> [W]e shall not aggravate the already difficult task of distinguishing between major disputes and minor disputes by adding a third category of hybrid disputes. We hold that if an employer asserts a claim that the parties' agreement gives the employer the discretion to make a particular change in working conditions without prior negotiation, and if that claim is arguably justified by the terms of the parties' agreement ( i.e., the claim is neither obviously insubstantial or frivolous, nor made in bad faith), the employer may make the change and the courts must defer to the arbitral jurisdiction of the Board.

*Id.* The Supreme Court's cautioning instruction in *Conrail* retains its vitality.

We will not create a new category of dispute absent further guidance from the

Court.

No matter the complexity with which the rail workers state their claim, this

is fundamentally a case concerning the enforcement of *preexisting* contractual

rights. The ultimate question is whether the alleged contracting of maintenance

obligations to New Mexico violated the existing CBA, which requires union employees to perform BNSF's maintenance work. This case is squarely a minor dispute under the RLA.

In conclusion, this is not a case involving the unilateral creation of a new collective bargaining agreement or even new terms or rights under the existing CBA. Instead, it falls comfortably under *Conrail*'s default category of minor disputes in which a party seeks to enforce a collective bargaining agreement.

### III. Conclusion

Because the dispute is minor, it is subject to mandatory arbitration. The district court correctly determined arbitration is the proper venue for this dispute, and we therefore AFFIRM its order.

Given the above conclusion, we need not address the sovereign immunity issues concerning the Secretary. Appellants' Renewed Motion for an Injunction Pending Appeal is DENIED without prejudice.