**F I L E D**

**PUBLISH**

**August 11, 2006**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

BROTHERHOOD OF MAINTENANCE
OF WAY EMPLOYES DIVISION/IBT,

      Plaintiff-Counter/Defendant-
Appellee,

v.

UNION PACIFIC RAILROAD
COMPANY,

      Defendant-Counter/Claimant-
Appellant.

No. 05-1511

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 05-CV-646-WDM-MJW)

Clifford A. Godiner, Thompson Coburn LLP, St. Louis, Missouri, for Defendant-
Counter/Claimant-Appellant.

Richard S. Edelman, O'Donnell, Schwartz & Anderson, P.C., Washington, D.C. (William
A. Bon, General Counsel, Brotherhood of Maintenance of Way Employes, Southfield,
Michigan, with him on the briefs), for Plaintiff-Counter/Defendant-Appellee.

Before **HENRY, BRISCOE,** and **LUCERO**, Circuit Judges.

**BRISCOE**, Circuit Judge.

Plaintiff Brotherhood of Maintenance of Way Employes Division (BMWED)[1] filed this action claiming that defendant Union Pacific Railroad Company (UP) violated the Railway Labor Act (RLA), 45 U.S.C. § 151 et seq. UP moved to dismiss BMWED's action as a "minor dispute" over which the district court lacked subject matter jurisdiction, and also moved for a preliminary injunction prohibiting BMWED-represented employees from striking. The district court granted UP's motions, but conditioned the granting of the anti-strike injunction upon the parties submitting their dispute to a previously-formed arbitration panel. UP now appeals, asserting the district court lacked jurisdiction and/or erred in imposing this condition on the grant of UP's motion for an anti-strike injunction. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and reverse and remand with directions to the district court to grant UP's motion for an anti-strike injunction, but to delete the condition that the parties submit their dispute to the previously-formed arbitration panel.

I.

UP operates a railway system in the central and western portions of the United States. BMWED is an unincorporated labor association and the collective bargaining representative for those UP employees who maintain, repair, and inspect railroad tracks

---

[1] The parties, and in turn the court, have, both in previous cases and in the present case, utilized two different spellings of BMWED's full name: "Brotherhood of Maintenance of Way Employes Division" and Brotherhood of Maintenance of Way Employees Division." BMWED's web site confirms, however, that "Employes" is the correct spelling of the name. BMWED Home Page, http://www.bmwe.org.

and other railroad facilities. UP and BMWED are parties to several collective bargaining agreements (CBAs), including agreements that cover different portions of UP's railway system.[2] For example, one CBA covers BMWED-represented employees who work on the "UP Proper," which encompasses the northern and western portions of the UP system, and includes facilities and operations in Laramie, Wyoming. This CBA will be referred to herein as the UP Proper Agreement. Another CBA covers BMWED-represented employees who work on the "Southern Division," which, as its name suggests, encompasses the southern portion of the UP system, and includes facilities and operations in North Little Rock, Arkansas. This CBA is generally referred to as the MPRR Agreement.[3] In addition to the CBAs that cover portions of the railway system, UP and BMWED are also parties to an industry-wide CBA dated February 7, 1965 (the February 7th Agreement) which provides, in pertinent part, that carriers such as UP "have the right to transfer work and/or transfer employees throughout the system which do not require the crossing of craft lines." App. at 59.

In performing track construction and maintenance, BMWED-represented employees engage in what is referred to as "fabrication," which involves attaching rails to wooden ties to create a section of track. Id. at 58. A necessary component of this process

---

[2] According to the record, UP is a product of various mergers that combined the rail lines and properties of former rail carriers, each of which had their own CBAs in place.

[3] It so named because UP acquired the territory constituting the Southern Division by way of a merger with the Missouri Pacific Railroad.

is "plating" the ties, which involves attaching plates to the wooden ties. The rails are then, in turn, fastened to the ties.

The UP Proper Agreement provides, in pertinent part, that the "[c]onstruction and maintenance of roadway and track, such as rail laying, tie renewals, ballasting, surfacing and lining track, fabrication of track panels . . . and other work incidental thereto will be performed by forces in the Track Subdepartment." Id. at 18, 68. In 1999, however, UP announced that it would begin purchasing pre-fabricated track panels for use on the UP Proper, and would therefore close its plant in Laramie, Wyoming, where BMWED-represented employees fabricated track panels for use on the UP Proper. BMWED responded by filing suit against UP in federal court. That case was ultimately dismissed as a "minor dispute" under the RLA and referred for compulsory arbitration. See Bhd. of Maint. of Way Employees v. Union Pac. R.R., 19 Fed. Appx. 731 (10th Cir. 2000) ("BMWED I"). An arbitration board established by the parties under the RLA and headed by neutral member Gerald Wallin ultimately agreed with BMWED that UP's purchase of pre-fabricated track panels violated the above-quoted provision of the UP Proper Agreement (the Wallin Award).[4] App. at 113-22.

_____

[4] The Wallin board concluded that the UP Proper Agreement, "[a]s it relate[d] to track panel fabrication," "le[ft] unanswered the question" of whether it applied to fabrication work performed off of UP property. App. at 118. However, the Wallin board concluded that the answer to the question was "readily provided when the bargaining history surrounding" the Agreement "[wa]s taken together with the parties' historical practice regarding track panel fabrication." Id. at 119. In particular, the Wallin board found that UP "ha[d] agreed, by its practice of more than 20 years, that it w[ould] not seek to obtain from outside vendors any of the track panel fabrication work its Track Subdepartment forces have historically performed that would be embodied in the finished

-4-

In 2002, UP began purchasing and installing pre-plated rail ties on the UP Proper. BMWED, concerned that this action was prohibited by the UP Proper Agreement, complained and the matter, which was again classified as a "minor dispute," was ultimately submitted to arbitration. On April 30, 2003, an arbitration board established by the parties under the RLA and headed by neutral member Herbert Fishgold found that UP's purchase of pre-plated ties would violate the above-quoted provisions of the UP Proper Agreement by taking work away from BMWED-represented employees (the Fishgold Award).[5] Id. at 135-51.

On December 2, 2003, UP notified BMWED that, pursuant to the terms of the February 7th Agreement, it was transferring all tie plating work being performed on the UP Proper to its North Little Rock, Arkansas, track panel plant located in UP's Southern Division. Id. at 152. The work at that plant is governed by the MPRR Agreement and the past practices thereunder. In its notice, UP indicated that the transferred work would "be performed by employees coming under the jurisdiction" of the MPRR Agreement. Id. "UP asserts, and BMWED does not deny, that in the Southern Division UP has a long-

_____

products of an outside vendor," and that "this prohibition [wa]s an implicit unwritten term of the [UP Proper] Agreement." Id. at 121.

[5] The Fishgold Award concluded, in pertinent part, that the UP Proper Agreement "reserve[d] track construction of which tie plating [wa]s an integral part, to BMWE[D]," and that there was nothing in the UP Proper Agreement "that expressly limit[ed] such work only if performed on UP's operating property." App. at 144. The Fishgold Award further concluded that the Agreement "reserve[d] the work of track construction, of which tie plating [wa]s an integral step to BMWE[D] forces, so long as it is performed at UP's initiative, for its benefit and its expense." Id. at 148.

standing practice of purchasing pre-plated ties from third parties, a practice in which BMWED has acquiesced." App. at 395. BMWED, however, "appears to have been under the impression that all the transferred work would still be done by BMWED-represented employees." Id. at 399; see also Aplee's Br. at 7 n.2.

In early 2004, disputes arose between BMWED and UP regarding UP's use of pre-plated ties, including pre-plated ties that UP purchased prior to the issuance of the Fishgold Award. Id. at 45. For example, in January 2004, BMWED contacted UP and objected after learning that UP was performing track work in Nampa, Idaho, using pre-plated ties that were not pre-plated by BMWED-represented employees. Accordingly, on February 9, 2004, BMWED filed a lawsuit seeking to enforce the Fishgold Award. Brotherhood of Maint. of Way Employes v. Union Pac. R.R. Co., Case No. 04-Z-0239 (D. Colo.) ("BMWED II"). Id. at 170. UP moved to dismiss BMWED's lawsuit, arguing that it was a "minor dispute" over which the district court lacked subject matter jurisdiction (as to the merits, UP's position was that the Wallin and Fishgold Awards had been rendered moot by the transfer of the tie-plating work to a location within the scope of the MPRR Agreement). On January 27, 2005, the district court granted UP's motion to dismiss and UP's motion for a preliminary injunction prohibiting BMWED from striking. Id. at 42. In doing so, the district court agreed that the dispute was a minor one, in that it would require the district court to interpret the Fishgold Award in several respects. Accordingly, the district court remanded the matter to the Fishgold arbitration board.

While the BMWED II suit was still pending, BMWED learned that UP had entered

-6-

into an arrangement with a company named Nevada RR. Under UP's arrangement with Nevada RR, Nevada RR set up a facility in UP's North Little Rock yard and, using non-BMWED-represented employees, produced pre-plated ties there which it then provided to UP. In the spring of 2005, BMWED confirmed that UP was buying from Nevada RR pre-plated ties for installation on UP Proper lines.

On April 7, 2005, BMWED filed the present lawsuit against UP. BMWED's complaint alleged that, by installing on the UP Proper pre-plated rail ties and pre-fabricated track panels produced by Nevada RR, UP violated Section 2 Seventh of the RLA by effecting a unilateral change of the UP Proper Agreement.[6] In conjunction with the filing of its lawsuit, BMWED served a ten-day strike notice on UP.

UP moved to dismiss BMWED's lawsuit for lack of subject matter jurisdiction, contending the dispute was a minor one, and that the lawsuit was essentially identical to BMWED II. UP also moved for a preliminary injunction prohibiting BMWED from striking. On October 26, 2005, the district court issued an order conditionally granting UP's motion to dismiss and preliminarily enjoining a strike by BMWED. In its order, the district court concluded that the dispute at issue was a minor one and that it therefore lacked subject matter jurisdiction over the dispute. Notably, however, the district court granted UP's motions pursuant to the following conditions:

---

[6] BMWED later filed an amended complaint adding a second claim, i.e., that UP's actions were in violation of the assertion in its December 2, 2003, letter that the transferred work would "be performed by employees" covered by the MPRR Agreement. App. at 274-75.

a. The parties submit the issues in dispute to the special board of adjustment known as the Fishgold board or panel within 20 days of the date of this order;

b. [UP] shall continue to require that any pre-plated ties installed on the UP Proper be pre-plated by employees represented by [BMWED].[7]

App. at 410.

## II.

In its appeal, UP contends the district court erred, and indeed lacked subject matter jurisdiction, to condition the granting of the anti-strike injunction on the parties submitting their dispute to the Fishgold arbitration panel. Questions involving a district court's subject matter jurisdiction are reviewed de novo by this court. See Australian Gold, Inc. v. Hatfield, 436 F.3d 1228, 1234 (10th Cir. 2006). Assuming the district court had subject matter jurisdiction to issue an anti-strike injunction, we review for abuse of discretion the district court's decision to grant that injunction, including the conditions placed by the district court on that injunction. See Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas R. Co., 363 U.S. 528, 535 (1960) (MKT); see also Wyandotte Nation v. Sebelius, 443 F.3d 1247, 1252 (10th Cir. 2006) (noting the general rule that abuse of discretion standard applies to district court's grant or denial of preliminary injunction). In doing so, we review the district court's determinations of law de novo.

---

[7] BMWED, in its response in opposition to UP's motion for a preliminary injunction, argued "that if the Court grants the anti-strike injunction sought by UP, the Court should also assert its general equitable authority to condition its injunction by requiring that the parties submit the issues in dispute to the Fisghold [sic] Board." App. at 351.

Burlington Northern & Santa Fe Ry. Co. v. Bhd. of Locomotive Eng'rs, 367 F.3d 675, 678 (7th Cir. 2004). A district court "necessarily abuses its discretion when it commits an error of law," and a decision to grant "a preliminary injunction that is premised on an error of law is entitled to no deference and must be reversed." United Air Lines v. Int'l Ass'n of Machinist and Aerospace Workers, 243 F.3d 349, 361 (7th Cir. 2001).

*The RLA dispute resolution framework*

We begin by outlining the RLA's dispute resolution framework in general, and its minor dispute resolution framework in particular. The RLA provides a comprehensive and mandatory framework for the resolution of labor disputes between carriers (i.e., railroad operators) and labor organizations that represent employees of those carriers. See Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 252 (1994). Under this framework, such disputes are classified as either "major" or "minor." See id. "Major disputes relate to the formation of collective [bargaining] agreements or efforts to secure them." Id. (brackets in original; internal quotation marks omitted). "Minor disputes," in contrast, "relate[] either to the meaning or proper application of a particular provision [of a CBA] with reference to a specific situation or to an omitted case." Consol. Rail Corp. v. Ry. Labor Executives Ass'n, 491 U.S. 299, 303 (1989) (Conrail). In other words, "major disputes seek to create contractual rights, minor disputes to enforce them." Id. at 302. In this case, it is now uncontroverted that the parties' dispute is a "minor" one under the RLA (as were the prior two disputes that lead to the Wallin and Fishgold Awards).

*The RLA's minor dispute resolution procedures*

The RLA offers two alternative mechanisms for the resolution of so-called minor disputes. First, either party to a minor dispute may petition the National Railroad Adjustment Board (NRAB) to decide the dispute. 45 U.S.C. § 153, First (i). The NRAB is a permanent, government-sponsored arbitration panel composed of 34 total members, half of which are selected by carriers and the other half of which are selected by labor organizations that represent railroad employees. Id. First (a). If the NRAB is unable to resolve a dispute "because of a deadlock or inability to secure a majority vote of [its] members," a neutral person, known as a "referee," is selected to sit with the NRAB and help resolve the dispute. Id. First (l). Second, and alternatively, the parties to a minor dispute can, if mutually agreeable, establish their own arbitration board to resolve the dispute. Id. Second. Under this procedure, each party to a minor dispute typically appoints one member to the arbitration board. Id. If the two-member arbitration board is unable to agree on the outcome of the dispute, a third, neutral member is selected to help resolve the dispute. Id. Whichever of the two procedures is used, an award resolving the dispute is considered final and binding upon both parties to the dispute. Id. First (m); Second.

In their prior disputes, BMWED and UP relied on self-established arbitration boards, i.e., the Wallin and Fishgold boards, rather than the NRAB. The Wallin board concluded that UP violated the UP Proper Agreement when it used persons other than BMWED-represented employees to fabricate track panels to be used in constructing and

-10-

maintaining tracks on the UP Proper. The Fishgold board concluded that the pre-plating of rail ties for use in the construction and maintenance of tracks was work which was to be performed by BMWED-represented employees, and that the pre-plating of such tracks by a third-party manufacturer violated that rule.

*District court's subject matter jurisdiction*

UP contends that the district court lacked subject matter jurisdiction to place conditions on the granting of UP's motions. More specifically, UP contends that, "once the District Court determined that the claim forwarded in BMWED's Amended Complaint raised a minor dispute, it had no subject matter jurisdiction over the lawsuit," and thus no authority to "place conditions on its dismissal" of the case. Aplt. Br. at 26.

As UP correctly notes, district courts lack subject matter jurisdiction over minor disputes. See Conrail, 491 U.S. at 303-04, 320. That said, however, district courts "may enjoin strikes arising out of minor disputes." Id. at 304. As the Supreme Court stated in Brotherhood of Railroad Trainmen v. Chicago River and Indiana Railroad Company, 353 U.S. 30, 41 (1957), it "has authorized the use of injunctive relief to vindicate the processes of the Railway Labor Act." That is, the Supreme Court has approved of district courts enjoining strikes during the consideration of minor disputes by the boards authorized under the RLA to hear such disputes. In addition, the Supreme Court has also held that a district court may impose conditions on such injunctive relief, "at least where the[] [conditions] are designed . . . to promote the interests of justice, [and] also to preserve the jurisdiction of the [RLA's arbitration] Board." MKT, 363 U.S. at 534.

-11-

Thus, contrary to UP's assertion, we conclude the district court had jurisdiction to not only enjoin BMWED from striking during the resolution of the parties' minor dispute, but to also place conditions on the granting of that injunctive relief.

*Did the condition imposed by the district court amount to an abuse of discretion?*

That leads to UP's main argument, i.e., that the district court erred when it conditioned the anti-strike injunction upon the parties' minor dispute being remanded to, and decided by, the Fishgold board. In electing to impose this condition, the district court offered two rationales: (1) the possibility of inconsistent decisions from two different arbitration panels (i.e., the Fishgold board and a new board created by the parties to hear the instant dispute); and (2) "reference to a panel with familiarity of the issues [i.e., the Fishgold board] preserves arbitration resources and leads to more efficient resolution . . . ." App. at 409.

Although both of these rationales seem reasonable at first blush, the condition imposed by the district court is inconsistent with the remedial scheme for "minor disputes" set forth in the RLA. As previously noted, when a minor dispute within the scope of the RLA arises, the RLA affords the parties two alternative, and exclusive, methods for resolving the dispute: (1) submit the dispute for arbitration before the NRAB; or (2) establish their own arbitration board and have that board resolve the dispute. By conditioning its grant of the anti-strike injunction on the parties submitting their dispute to the Fishgold panel, the district court effectively ignored these provisions of the RLA and deprived UP of its statutory right to have either the NRAB or a newly-formed-board

-12-

decide the dispute (based upon its pleadings, UP appears to favor the creation of a new board).  See generally MKT, 363 U.S. at 531 (noting that a federal district court's authority to enjoin a strike arising out of a minor dispute hinges on the dispute being "properly submitted" for arbitration under the provisions of the RLA), 532 (noting "that the federal courts ought not act in such a way as to infringe upon the jurisdiction of the" NRAB); cf. Order of Ry. Conductors of America v. Pitney, 326 U.S. 561, 567-68 (1946) (holding that district court erred in granting a permanent injunction finally resolving the merits of a minor dispute between a railroad and two employee accredited bargaining agents that was within the jurisdiction of the NRAB pursuant to the RLA).

Importantly, the RLA expressly provides that an arbitration board newly formed by the parties would have authority to "determine all matters not previously agreed upon by [UP] and [BMWED] with respect to the establishment and jurisdiction of the board." 45 U.S.C. § 153 Second.  In other words, a newly-formed board could first decide, as a threshold matter, whether the parties' instant dispute involved interpretations of the UP Proper Agreement, the MPRR Agreement, the February 7th Agreement, and/or the Fishgold Award.  To the extent the newly-formed board determined the instant dispute involved an interpretation of the Fishgold Award, it could then, pursuant to 45 U.S.C. § 153 First (m), refer the dispute back to the Fishgold board for resolution.  Similarly, to the extent the newly-formed board determined the instant dispute involved an interpretation of the February 7th Agreement, it could refer the dispute to the arbitration board specified in the February 7th Agreement (i.e., "Special Board of Adjustment No. 1087").

The possibility that a newly-formed arbitration board might render an award inconsistent with the Fishgold Award is simply a product of the resolution scheme established by the RLA, and cannot, standing alone, justify the imposition of the condition imposed by the district court. Indeed, when the parties created the Fishgold board to resolve their prior dispute, the risk existed that the Fishgold board might issue an award that was inconsistent with the Wallin Award.

*The concurring/dissenting viewpoint*

We are not convinced by the various rationales offered by the concurring/dissenting opinion in support of the district court's decision to condition the anti-strike injunction upon the parties' minor dispute being remanded to, and decided by, the Fishgold board. To begin with, we reject the assertion "that there has already been full compliance with the [RLA], not once, but twice." Conc./Dis. Op. at 1. This assertion effectively, and incorrectly, treats the parties' current dispute as part and parcel of their prior disputes. Although the instant dispute admittedly bears similarities to the prior disputes, it is by no means identical. Thus, we have no doubt that UP is entitled to have the current dispute, like the prior disputes, resolved in accordance with the mechanisms outlined in the RLA.

We likewise reject the suggestion that there is no "principled" way to distinguish this case from the Supreme Court's decision in MKT. Conc./Dis. Op. at 1. In our view, a proper reading of MKT reveals at least two important distinctions. First, at the time the district court in MKT issued its anti-strike injunction, the parties' dispute had already

-14-

been submitted to the NRAB for resolution. In other words, unlike the instant case, the parties were afforded their right to utilize the resolution framework outlined in the RLA. Second, and relatedly, the condition imposed by the district court in MKT did nothing to impinge upon the parties' rights under the RLA, or upon the NRAB's jurisdiction over the parties' dispute. To the contrary, the condition required the Railroads to preserve the status quo so that the NRAB could resolve the parties' dispute without the Railroads taking actions that would result in irreparable injury to the unions and the employees they represented. See MKT, 363 U.S. at 534 ("the action of the district judge . . . would operate to preserve [the NRAB's] jurisdiction by preventing injury so irreparable that a decision of the [NRAB] in the unions' favor would be but an empty victory."). In contrast, the condition imposed by the district court in this case, as we have already noted, effectively deprived UP of its rights under the RLA and thus did nothing to preserve the jurisdiction of the entities authorized under the RLA to decide the parties' dispute.

Finally, and relatedly, we reject the assertion that neither the RLA nor any RLA-related case prevents a district court from conditioning an anti-strike injunction on sending a dispute to an arbitrator of the court's choosing. For the reasons already outlined, it is clear that Congress, in enacting the RLA, intended to outline the exclusive means for parties to resolve so-called minor disputes. Were we to conclude that a district court could select who it believes would be best suited to resolve a particular dispute, we would effectively undermine the RLA and act contrary to Congressional intent. In addition to the RLA itself, MKT implicitly, if not explicitly, prohibits a district court from

-15-

choosing who should arbitrate a minor dispute. Recognizing that a district court may issue an anti-strike injunction in a case arising under the RLA, the Supreme Court in MKT held that any conditions imposed on such an injunction are proper if they "are designed not only to promote the interests of justice, but also to preserve the jurisdiction of the [NRAB]." 363 U.S. at 534 (emphasis added). By examining the merits of a dispute and directing the parties to send a dispute to an arbitrator of its own choosing, a district court effectively ignores the dictates of the RLA, infringes upon the jurisdiction of the entities authorized under the RLA to resolve minor disputes, and acts in contradiction of the holding in MKT.

*BMWED's motion to take judicial notice*

As a final matter, BMWED has filed a motion asking us to take judicial notice of, and to make part of the record on appeal in this case, an answer filed by UP in response to a complaint filed against it in the United States District Court for the Northern District of Oklahoma, United Transportation Union v. Union Pacific Railroad Company, 05-CV695TCK-FHM (UTU). The complaint in that case, a copy of which is attached to BMWED's motion, seeks to set aside an arbitration award issued pursuant to the RLA on the grounds that the plaintiff, United Transportation Union, was not given notice of, or the right to participate in, the arbitration. In its answer, a copy of which is also attached to BMWED's motion, UP asks the district court in that case, in the event it orders a new arbitration, to "provide directions on how to conduct th[e] [new] arbitration (answering questions such as may both unions sit on the arbitration panel) so that the parties can

-16-

avoid needless duplication of efforts or a possible third arbitration." In BMWED's view, this request for "directions" is inconsistent with the position taken by UP in the instant appeal.

After reviewing BMWED's motion and attachments, we conclude that the issues raised in the UTU case are different from those in the instant appeal, and thus we are not persuaded that the request for relief contained in UP's answer is necessarily inconsistent with the arguments it has advanced in the instant proceedings.[8] In any event, there is no indication in BMWED's motion that UP has, as of yet, obtained the relief it requested in its answer in the UTU case. Thus, BMWED is in no position to seek invocation of the doctrine of judicial estoppel. See generally Johnson v. Lindon City Corp., 405 F.3d 1065, 1069 (10th Cir. 2005) (noting that the doctrine of judicial estoppel hinges on a party successfully maintaining a certain position in another legal proceeding). Accordingly, we deny BMWED's motion.

BMWED's motion to take judicial notice is DENIED. The district court's order granting an anti-strike injunction in favor of UP is REVERSED and the matter REMANDED to the district court with directions to grant UP's motion for an anti-strike injunction, but to delete the condition that the parties submit their dispute to the previously-formed arbitration panel.

---

[8] In reaching this conclusion we offer no opinion on the propriety of UP's request for relief in the UTU case.

-17-

05-1511, <u>Brotherhood of Maintenance of Way Employes Division/IBT v. Union Pacific Railroad Company</u>

**LUCERO, J.**, Concurring in part, dissenting in part.


My respected colleagues do not predicate their reversal of this case on a claimed misapplication of <u>Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas RR. Co.</u>, 363 U.S. 528, 532 (1960) (<u>MKT</u>), and none appears warranted.  Instead, the panel majority delivers the novel pronouncement that the district court's equitable power to condition anti-strike injunctions has been indirectly limited by Congress' passage of the Railway Labor Act (RLA), 45 U.S.C. § 151 et seq.  Lack of a principled distinction of the Supreme Court's holding in <u>MKT</u>, coupled with my conclusion that the panel majority's novel pronouncement is unwarranted, leads me to dissent.

In concluding that this case is a "minor dispute" that must be sent back yet again to arbitration under the RLA, the majority fails to recognize that there has already been full compliance with the act, not once, but twice.  All parties have previously accepted the composition of the previous arbitration panels called to adjudicate essentially the same dispute, not once, but twice.  The Brotherhood of Maintenance of Way Employes Division (BMWED) and the Union Pacific Railroad Company (UP) have twice submitted their dispute, both involving track tie fabrication, to arbitration under the RLA, and BMWED has twice prevailed.  Faced with the third installment of this embittered saga, the district court fashioned a remedy that would end this dispute over track tie fabrication once and for all – it required the parties to submit all remaining disputes over the UP

Proper Agreement to the Fishgold arbitration panel. The majority concludes that the district court was without authority to impose this condition and remands the case for referral in "Groundhog Day" fashion to yet a third arbitration panel. I disagree that the RLA preempts the equitable powers of the federal courts to so condition anti-strike injunctions, and respectfully dissent on this point.

Neither the majority opinion or its response to my dissent presents any language from the RLA, any piece of legislative history, or any case establishing that the RLA's dispute resolution framework <u>preempts</u> or otherwise <u>excludes</u> the district court's powers to condition an anti-strike injunction on returning a dispute to a particular arbitrator. Rather, all we are told is that "the condition imposed by the district court is <u>inconsistent</u> <u>with</u> the remedial scheme for 'minor disputes' set forth in the RLA." Maj. op. at 12 (emphasis added). Inconsistency, however, does not equal preemption, and I would require more than mere conflict to circumscribe the powers of a district court sitting in equity. As stated by the Court in <u>MKT</u>, 363 U.S. at 532:

> Since the power to condition relief is essential to ensure that extraordinary equitable remedies will not become the engines of injustice, <u>it would</u> <u>require the clearest legislative direction to justify the truncation of that</u> <u>power</u>. Such direction, if it exists, presumably must be derived from the Railway Labor Act itself, and since that Act contains no express provisions circumscribing the equitable powers of the court, such limitations, if any, must be created by clear implication.

(emphasis added). Apart from lamenting the "conflict" between the RLA and this particular exercise of equitable power, the majority neither identifies a "clear[] legislative direction to justify the truncation" of the district court's equitable powers nor a "clear

implication" that such has been done. If the mere presence of a statutory dispute resolution scheme was sufficient to pro tanto strip the equitable powers of the district courts, those powers would be feeble indeed. This, I cannot accept.

I therefore dissent from the majority opinion insofar as it holds the district court lacked the power to condition an anti-strike injunction on returning the dispute to a particular arbitrator that had presided over a prior dispute involving the same contract. I concur in the remainder of the majority opinion.