**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 5, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ERIC VERLO; JANET MATZEN;
FULLY INFORMED JURY
ASSOCIATION,

      Plaintiffs - Appellees,

v.

THE CITY AND COUNTY OF DENVER,
COLORADO, a municipality,

      Defendant - Appellant,

and

CHIEF JUDGE MICHAEL MARTINEZ,
in his official capacity as Chief Judge of
the Second Judicial District; ROBERT C.
WHITE, in his official capacity as Denver
Chief of Police,

      Defendants.

No. 17-1291
(D.C. No. 1:15-CV-01775-WJM-MJW)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **SEYMOUR**, and **HOLMES**, Circuit Judges.
_____

This is the second time this matter has come before this court. Our prior

ruling, Verlo v. Martinez ("Verlo I"), 820 F.3d 1113 (10th Cir. 2016), addressed

_____

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

whether the district court had abused its discretion in entering a preliminary injunction against the City and County of Denver, Colorado (collectively, "Denver") and the Second Judicial District.  The preliminary injunction prohibited the enforcement of an administrative order against Plaintiffs-Appellees Eric Verlo, Janet Matzen, and the Fully Informed Jury Association ("FIJA") in a designated part of a courthouse plaza and thereby allowing Verlo and Matzen to engage in jury nullification pamphleteering in that area.

In this appeal, Denver challenges the district court's order finding Denver in contempt for violating the court's preliminary injunction.  We exercise jurisdiction under 28 U.S.C. § 1291 and REVERSE the district court's contempt order against Denver.

**I**

*A.     FIJA and FIJA Literature*

Plaintiffs-Appellees Verlo and Matzen are FIJA members who "passionately believe in the concept of jury nullification."  App., at 4.  FIJA members "believe[ ] that . . . each juror has the . . . ability to disregard unjust laws if they so desire," a freedom which "ha[s] been wrongfully stolen from the people by corrupt courts intent on protecting tyrannical laws."  Id. at 6.  FIJA members use pamphlets and other literature "to inform . . . the public and prospective or current jurors" about their belief "that a jury of one's peers is a bulwark between the law and tyrannical government."  Id. at 3.  Plaintiffs-Appellees regularly handed out literature

2

containing this content to passersby near the Lindsey-Flanigan Courthouse, where most of the criminal proceedings in Denver's Second Judicial District take place.

## B.    *The Plaza Order*

With the hope of avoiding potentially violent protests in connection with several high-profile cases scheduled for trial at the Lindsey-Flanigan Courthouse, the Chief Judge of the Second Judicial District issued an administrative order (the "Plaza Order"), which prohibited expressive activities in the area immediately surrounding the Courthouse. The Plaza Order stated in part:

> The Court has the responsibility and authority to ensure the safe and orderly use of the facilities of the Second Judicial District; to minimize activities which unreasonably disrupt, interrupt, or interfere with the orderly and peaceful conduct of court business in a neutral forum free of actual or perceived partiality, bias, prejudice, or favoritism; to provide for the fair and orderly conduct of hearings and trials; to promote the free flow of pedestrian and vehicular traffic on sidewalks and streets; and to maintain proper judicial decorum. Those having business with the courts must be able to enter and exit the Lindsey-Flanigan Courthouse freely, in a safe and orderly fashion and unhindered by threats, confrontation, interference, or harassment. Accordingly, the Court hereby prohibits certain expressive activities on the grounds of the Courthouse . . . without regard to the content of any particular message, idea, or form of speech.
>
> **Prohibited Activities:** The activities listed below shall be prohibited in the following areas: anywhere inside the Lindsey-Flanigan, including courtrooms, corridors, hallways, and lobbies; the areas, lawns, walkways, or roadways between the Courthouse and public sidewalks and roads; and any areas, walkways, or roadways that connect public sidewalks and roads to Courthouse entrances or exits. This includes the Courthouse entrance plaza areas on the east and west sides of the Courthouse . . .
>
> **1.    Demonstrating; picketing; protesting; marching; parading; holding vigils or religious services;**

**proselytizing or preaching; distributing literature or other materials, or engaging in similar conduct that involves the communication or expression of views or grievances; soliciting sales or donations; or engaging in any commercial activity; unless specifically authorized in writing by administration. . . .**

Id. at 133–34. Thus, the Plaza Order prohibited Plaintiffs-Appellees from distributing their jury nullification literature near the Lindsey-Flanigan Courthouse.

C.     *FIJA Member's Arrest, Plaintiffs-Appellees' Ensuing Lawsuit, and the Injunction*

Despite the Plaza Order's ban on pamphleteering, Plaintiffs-Appellees continued to distribute pamphlets regarding jury nullification to passersby near the Lindsey-Flanigan Courthouse. Upon the arrest of a FIJA member, allegedly in part for pamphleteering, Plaintiffs-Appellees filed this § 1983 action in the United States District Court for the District of Colorado, suing: Denver; Robert C. White, in his official capacity as Denver's chief of police; and Chief Judge Michael Martinez, in his official capacity as the Second Judicial District's chief judge.

Plaintiffs-Appellees challenged a portion of paragraph one of the Plaza Order. They sought a preliminary injunction "prohibiting the Defendants from arresting, prosecuting and incarcerating the Plaintiffs if they are merely standing in the public Plaza of the courthouse passing out literature and engaging in conversations with passersby regarding jury nullification." Id. at 7.

Denver did not oppose Plaintiffs-Appellees' motion for a preliminary injunction. In fact, one day before the district court held a hearing on the motion for

4

a preliminary injunction, Denver concluded the Plaza was a public forum and further

stipulated:

> 1. The Lindsey-Flanigan plaza ("Plaza") . . . is a public forum and any content-based regulations must be narrowly drawn to effectuate a compelling state interest and reasonable time, place and manner regulations.
>
> 2. Plaintiffs who wish to engage in peacefully passing out jury nullification literature to passersby on the Plaza are entitled to do so and . . . Denver, through its police or sheriff department, will not arrest or otherwise charge Plaintiffs for handing out literature regarding jury nullification so long as Plaintiffs do not violate Colorado law or Denver's Revised Municipal Code when they are handing out their literature. The parties stipulate that Plaintiffs' proposed intent of peacefully handing out jury nullification literature to or discussing jury nullification with passersby at the Plaza, without more, does not violate Colorado law. Plaintiffs acknowledge that their right to hand out literature regarding jury nullification is also subject to compliance with any other applicable law. . . .
>
> 4. On August 14, 2014, Denver District Court Chief Judge Michael Martinez entered an Order banning all speech activities from the courthouse plaza and the areas surrounding the courthouse. Denver stipulates that it does not intend to enforce the August 14, 2015 Order as written and will only impose content and viewpoint neutral reasonable time, place and manner restrictions on the use of the Plaza, and/or other exterior areas surrounding the Plaza if Denver determines that a compelling need exists to do so.

Id. at 117–18 (emphasis added). In summary, Denver stipulated that the restricted

area of the Plaza was a public forum and that it would not enforce the challenged

portion of paragraph one of the Plaza Order as it pertained to Plaintiffs-Appellees'

pamphleteering.

5

The Second Judicial District disagreed with Denver's view that the restricted area of the Plaza was a public forum and opposed Plaintiffs-Appellees' preliminary injunction motion. The Second Judicial District argued that the restricted area of the Plaza was a nonpublic forum. This conflict presented a face-off between two parties who had, and continue to have, interests in the restricted area of the Plaza. Denver owns the land on which, by operation of state statute, the Lindsey-Flanigan Courthouse sits, while the Second Judicial District, as the occupant of the Courthouse, has an interest in limiting activities that may disrupt the operation of the court.

Despite this dispute between the restricted area's landowner and its occupant, the district court did not resolve whether, as a matter of law, the restricted area was a public or nonpublic forum. Instead, the district court "assumed that if Denver designated the Courthouse Plaza as a public forum, then the Courthouse Plaza was designated a public forum for all purposes and from all perspectives." Id. at 756. Relying on that assumption, the district court concluded the preliminary injunction factors favored Plaintiffs-Appellees and granted their motion for a preliminary injunction. The district court narrowly enjoined enforcement of the portion of paragraph one of the Plaza Order banning Plaintiffs-Appellees and other FIJA members from handing out jury nullification literature in the restricted area.

The preliminary injunction stated:

> The City and County of Denver, its police chief, Robert C. White,
> in his official capacity, and the Second Judicial District
> (including their respective officers, agents, servants, employees,

6

attorneys, and other persons who are in active concert or participation with any of them) (collectively, "Defendants") are PRELIMINARILY ENJOINED as follows (all capitalized terms bear the respective meanings assigned above):

a.　　Save for any Plaintiff physically located on the Landscaping or Gravel Area, Defendants shall not enforce Paragraph 1 of the Plaza Order against any Plaintiff (including any FIJA member) physically located in the Restricted Area to the extent he or she is otherwise lawfully seeking to distribute and/or orally advocate the message contained in the pamphlets titled "Fresh Air for Justice" and/or "Your Jury Rights: True or False?"

b.　　To the extent consistent with the foregoing prohibition, Defendants remain free to enforce Paragraphs 2–4 of the Plaza Order.

Id. at 152–53.

Under an abuse of discretion standard on interlocutory appeal, we affirmed the district court's entry of the preliminary injunction. Verlo I, 820 F.3d at 1147. However, we noted the importance of the district court first determining the forum status of the restricted area, stating, "[b]ecause the nature of the forum dictates the standard of scrutiny with which restrictions on speech are reviewed, courts typically begin the analysis of a challenge to restrictions on government property by identifying the nature of the forum involved." Id. at 1129. We then provided the district court guidance on the forum status question, alerting the court that this issue "will remain central to the district court's permanent injunction analysis." Id. at 1137.

In Verlo I, we also highlighted the fact that Denver and the Second Judicial District disagreed regarding the forum status of the restricted area. We stated the

7

district court will have to grapple with "questions about the intersection between a government property owner's power to designate its property as a public forum and the rights of the occupant of the government property—in this case another government entity—to use that property without interference." Id. at 1144. We cautioned, although Denver and Plaintiffs-Appellees' "Stipulation provides some evidence on the question of whether the Restricted Areas have been designated as public fora, it is not alone determinative." Id. at 1147.

D.     *The District Court Dismisses Denver and Later Holds it in Contempt*

By the time this case was before the district court for a ruling on a motion for permanent injunction, the district court had dismissed Denver from the case for lack of jurisdiction based on Denver's stipulation and the resulting lack of controversy between Denver and the Plaintiffs-Appellees. This later became problematic when Denver changed its position regarding the restricted area's status as a public forum and aligned itself with the Second Judicial District by "de-designating" the restricted area as a public forum. App., at 686. While it purported to de-designate the restricted area as a public forum, Denver simultaneously asserted that it did not intend to alter its previous stipulation that the restricted area was a public forum, stating "the decision to de-designate is prospective only." Id. Although the district court expressed understandable confusion regarding Denver's position, the court did not reinstate Denver as a party nor did any party request that it do so.

Meanwhile, despite the operative preliminary injunction which permitted Plaintiffs-Appellees to pamphleteer, Denver police arrested a FIJA member,

8

allegedly based in part on his distribution of jury nullification literature. As a result, Plaintiffs-Appellees filed a motion for an order to show cause why Denver, now a nonparty to the case, should not be held in contempt of court.

Before holding an evidentiary hearing on Plaintiffs-Appellees' contempt motion, the district court first held a hearing to determine whether it should convert the preliminary injunction to a permanent injunction. The district court declined to enter a permanent injunction, independently determined the Plaza's restricted area was not a public forum, and "dissolved" the preliminary injunction. Id. at 807. In its order "dissolving" the preliminary injunction, the district court heeded our comments set forth in Verlo I:

> Denver's choice not to withdraw from the Stipulation means that the Courthouse Plaza remains a designated public forum *as it relates to Denver's ability to impose restrictions on the property*. But it is manifest that Denver's Stipulation does not bind the Second Judicial District. And if the preliminary injunction hearing had been framed in these terms, the result may have been different—for, as the Court noted then,[1] courthouse grounds are routinely deemed to be nonpublic fora. *See Verlo I*, 124 F. Supp. 3d at 1093 n.5. However, no party (nor the Court) raised the question of whether "separate sovereigns" could each designate the forum status of the same piece of property for their own purposes, likely because it is truly a novel circumstance that none of us had considered possible. Moreover, the Second Judicial District argued solely under the strict scrutiny test. Thus, the Court had no occasion to consider seriously the possibility that the Courthouse Plaza was a nonpublic forum as it relates to the Second Judicial District's separate enforcement authority.

---

[1] At the preliminary injunction hearing, the district court noted, "[a]bsent the stipulation[,] we'd be dealing with a much different situation[ ] because our research has indicated that the areas in front of courthouses, the cases have held, are not public forums." App., at 464.

9

Id. at 757–59 (second emphasis added).

Later that day, the district court also held Denver in contempt of court for violating the preliminary injunction, entered final judgment in favor of the Second Judicial District and against Plaintiffs-Appellees, and terminated the case. As a contempt sanction, the district court ordered Denver to pay Plaintiffs-Appellees' reasonable attorneys' fees and expenses incurred in connection with the contempt proceedings. The question presented in this appeal is whether Denver can be held in contempt for violating the preliminary injunction.

## II

We first conclude that we have jurisdiction under 28 U.S.C. § 1291 to review the district court's contempt order against Denver. Both Denver and Plaintiffs-Appellees argue that the district court's contempt order is final and appealable. In support, however, both parties mistakenly cite to cases involving postjudgment contempt proceedings. We have long held that "in the *postjudgment* stage of a case, '[o]nce the finding of contempt has been made and a sanction imposed, the order has acquired all the 'elements of operativeness and consequence necessary to be possessed by any judicial order to enable it to have the status of a final decision' under 28 U.S.C. § 1291." O'Connor v. Midwest Pipe Fabrications, Inc., 972 F.2d 1204, 1208 (10th Cir. 1992) (quotation omitted). Thus, we have jurisdiction to review contempt orders entered postjudgment after the district court has completed two steps: (1) "made a finding of contempt," and (2) "imposed specific, unavoidable

sanctions." Consumers Gas & Oil, Inc. v. Farmland Indus., Inc., 84 F.3d 367, 370 (10th Cir. 1996). This rule has prudently been crafted to avoid piecemeal litigation.

However, Denver does not appeal from a postjudgment order. Rather, Denver appeals the district court's prejudgment contempt order. And, Denver brings this appeal after the district court's entry of final judgment in the case.[2] As it relates to the procedural posture of the present case, we have stated, "[g]enerally, 'a party[3] to a pending proceeding may not appeal from an order of civil contempt except as part of an appeal from a final judgment.'" Id. at 370 (emphasis added); Fox v. Capital Co., 299 U.S. 105, 107 (1936) ("[E]xcept in connection with an appeal from a final judgment or decree, a party to a suit may not review upon appeal an order fining . . . [it] for the commission of a civil contempt." (emphasis added)).

We have consistently held that earlier interlocutory orders merge with the final judgment. See McBride v. CITGO Petroleum Corp., 281 F.3d 1099, 1104 (10th Cir. 2002). It follows, then, that upon appeal from a final judgment, we may review the district court's prejudgment contempt orders which merge into the final judgment.

---

[2] Denver's notice of appeal following final judgment specifically named the district court's prejudgment contempt order, which appears in the docket entry preceding final judgment and was entered the same day. App., at xix–xx, 41. We thus have an appeal following entry of a final judgment seeking our review of the contempt order which preceded it. See Bohn v. Park Cty. Grp., Inc., 94 F.3d 1457, 1460 (10th Cir. 1996) (holding we have jurisdiction to review issue on appeal where plaintiff filed notice of appeal after district court entered final judgment and only specified the order and issue plaintiff intended to pursue on appeal); Fed. R. App. P. 3(c)(1)(B) (requiring notice of appeal to "designate the judgment, order, or part thereof being appealed").

[3] Denver is a nonparty to the proceedings at the district court. The effect of this fact is discussed below.

11

See M&C Corp. v. Erwin Behr GMBH & Co., 289 F. App'x 927, 935 (6th Cir. 2008) (unpublished) ("[A] judgment of civil contempt is not [itself] a final decree, and therefore is not appealable *in the absence of a final judgment. . . .* This appeal involves a final judgment, and . . . the policy of preventing piecemeal litigation is served when final judgment exists because the concern that the appeal of the contempt order represents an interlocutory order is not present. . . . [W]e have jurisdiction in this case."). Nevertheless, we have not detailed what specifics, if any, must be present in a district court's prejudgment contempt order to permit our review of that order after appeal from final judgment, and whether they differ from the two-step jurisdictional requirement for review of postjudgment contempt orders.

The Ninth Circuit has held, even when a final judgment has been entered, a prejudgment civil contempt order is not appealable until the district court has (1) made a finding of contempt and (2) imposed specific sanctions. See S.E.C. v. Hickey, 322 F.3d 1123, 1127 (9th Cir. 2003) ("Even if the underlying action has proceeded to a final judgment, 'an adjudication of civil contempt is not appealable *until sanctions have been imposed.*'" (quoting Donovan v. Mazzola, 761 F.2d 1411, 1417 (9th Cir. 1985)).[4] Assuming, without deciding, that we apply the two-step

---

[4] Our unpublished disposition in United States v. Gonzales, 531 F.3d 1198 (10th Cir. 2008) (unpublished)—another postjudgment civil contempt case—cites to Hickey, as well as cases from the Fifth, Seventh, and Eighth Circuits, for the proposition that postjudgment civil contempt orders remain interlocutory until the district court makes both a finding of contempt and imposes a sanction. See id. at 1202. However, our ruling in Gonzales does not discuss what implications, if any, this postjudgment rule has on appeals from final judgment of prejudgment civil contempt orders.

jurisdictional inquiry to prejudgment civil contempt orders appealed from final judgment, this case satisfies both requirements.

We have a finding of contempt and the imposition of specific sanctions. The district court found Denver in contempt for violating the preliminary injunction. The district court also imposed a specific sanction against Denver. Denver must pay Plaintiffs-Appellees' "fees and expenses reasonably incurred in the course of the[ ] contempt proceedings." App., at 827. Moreover, that award has been reduced to a sum certain.[5] See D. Ct. Dkt. 209.[6] The payment of $48,329.08[7] in Plaintiffs-Appellees' attorneys' fees and expenses incurred in pursuit of their contempt claim against Denver is a specific and unavoidable sanction, absent reversal of the district court's contempt finding. Therefore, even were we to impose the strictest

---

[5] Postjudgment, we have not stated that we must await reduction of sanctions to a sum certain; rather, we have only required that "specific, unavoidable sanctions" be imposed. Farmland, 84 F.3d at 370.

[6] Publicly-filed documents from the district court's docket are relevant to the resolution of this case, and we may take judicial notice of them. See Fed. R. Evid. 201; Allen v. Zavaras, 416 F. App'x 784, 785 n.2 (10th Cir. 2011) (unpublished).

[7] To the extent that this appeal remained interlocutory prior to the district court's order reducing the contempt sanction to a sum certain, "when a district court has adjudicated all remaining outstanding claims before this appellate court acts to dismiss the appeal, we will consider the appeal on its merits rather than dismiss for lack of jurisdiction." Lewis v. B.F. Goodrich Co., 850 F.2d 641, 645 (10th Cir. 1988). In so holding, we have reasoned that the Supreme Court has urged a practical, not technical, approach to finality under § 1291. See Gillespie v. United States Steel Corp., 379 U.S. 148, 152 (1964). This approach should balance the harms of piecemeal litigation with justice denied by delay of review. See id. In this case, we do not expect a separate appeal of the fee award because Denver stipulated "Plaintiffs are entitled to . . . $48,329.08 for the contempt proceeding." D. Ct. Dkt. 208, at 2. Thus, concerns associated with piecemeal litigation are not present here.

13

jurisdictional standards traditionally required for appeals of postjudgment civil contempt orders, this case meets them.

Denver is also a nonparty to the proceedings at the district court, and "[t]he right of a nonparty to appeal an adjudication of contempt cannot be questioned." U.S. Catholic Conference v. Abortion Rights Mobilization, Inc., 487 U.S. 72, 76 (1988) (concluding an "order finding a nonparty witness in contempt is appealable notwithstanding the absence of a final judgment in the underlying action"); see In re Woosley, 855 F.2d 687, 688 (10th Cir. 1998) ("[A] nonparty may generally appeal an order holding [it] in civil contempt. . . . [I]t is that status as a nonparty which entitles [it] to perfect an appeal before a final judgment has been entered." (quotation omitted)).

Thus, we conclude we have jurisdiction to review the district court's prejudgment civil contempt order that Denver appealed after the entry of final judgment. We now turn to the merits of this appeal.

### III

Denver contends the district court lacked authority to hold it in civil contempt for violating a preliminary injunction that the court had earlier "dissolved" because it was held in contempt of an invalid order.[8] We agree with Denver and reverse the district court's contempt order.

---

[8] Denver advances two additional arguments in support of its assertion that the district court erred by holding it in contempt of court. Denver also claims the district court erred by holding it in contempt for failing to "educate its officers" because that was not an obligation specified in the injunction. App., at 826. And, Denver argues

"We review a district court's determination of civil contempt for abuse of discretion." F.T.C. v. Kuykendall, 371 F.3d 745, 756 (10th Cir. 2004). "In doing so, however, we review the district court's conclusions of law de novo and any findings of fact for clear error." Reliance Ins. Co. v. Mast Constr. Co. ("Reliance I"), 84 F.3d 372, 375 (10th Cir. 1996). "Abuse of discretion is established if the district court's adjudication of the contempt proceedings is based upon an error of law or a clearly erroneous finding of fact." Id. at 375–76.

A civil contempt claim is unsupported when certain circumstances arise. "[A] claim for civil contempt must fall if the order that was disobeyed is subsequently reversed by the issuing court or the appellate court, or if its issuance exceeded the power of the issuing court." Id. at 376. That is, if "events prove [the injunction] was erroneously issued," United States v. United Mine Workers of America, 330 U.S. 258, 295 (1947), then any contempt order subsequently entered falls with the injunction. Under other circumstances where an injunction terminates, a contempt order may still stand. These circumstances include reasons unrelated to the merits of the injunction, such as the "passage of time or mootness." Reliance I, 84 F.3d at 376.

The logic of these rules is evident in that civil contempt sanctions are imposed to compensate a wronged party for another's disobedience of a court order. See United Mine Workers, 330 U.S. at 303–04. If, however, the alleged wrongdoer should not have been enjoined, then there is no basis for compensating the

the district court lacked clear and convincing evidence of its disobedience of the injunction. Because we conclude Denver's first argument prevails and warrants reversal, we do not address Denver's additional arguments.

15

injunction's beneficiary.  See Hyde Constr. Co. v. Koehring Co., 388 F.2d 501, 511 (10th Cir. 1968).

In this case, the district court stated it was "dissolving" the preliminary injunction, App., at 809, which implies changed conditions rendered the injunction no longer necessary.  Such a ruling does not indicate legal or factual error in the entry of the injunction in the first instance.  Were this the case, the district court would have had the power to hold Denver in contempt for violating an injunction that was legally proper at a time when it was in full force, even if the injunction were later "dissolved."  See United Mine Workers, 330 U.S. at 293–94 ("An injunction duly issuing out of a court of general jurisdiction with equity powers, upon pleadings properly invoking its action, and served upon persons made parties therein and within the jurisdiction, must be obeyed by them. . . . [U]ntil its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected, and disobedience of them is contempt of its lawful authority, to be punished." (quoting Howat v. Kansas, 258 U.S. 181, 189–90 (1922))).

However, looking beyond the district court's label for its action, the record reveals that, at the permanent injunction stage of litigation, the district court effectively reversed itself after concluding the preliminary injunction was issued in error.  See Brotherhood of Maint. of Way Emp. Div./IBT v. Union Pac. R. Co., 460 F.3d 1277, 1282 (10th Cir. 2006) (stating an injunction premised on an error of law must be reversed).  Once the legal merits of the status of the Plaza were more closely

16

examined, the district court determined that the preliminary injunction was based on incorrect assumptions regarding the legal questions presented.

In ruling on the preliminary injunction, the district court did not decide "whether Denver or the Second Judicial District sp[oke] for the First Amendment status of the Courthouse Plaza." App., at 750. Instead, the district court "assumed that if Denver designated the Courthouse Plaza as a public forum, then the Courthouse Plaza was designated a public forum for all purposes and from all perspectives," id. at 756, despite the fact that the Second Judicial District asserted the restricted area was not a public forum. Based on the district court's assumption, the court concluded at the preliminary injunction stage that Plaintiffs-Appellees were likely to succeed in proving that Denver controlled the First Amendment status of the restricted area, and likely to succeed in proving the restricted area was a designated public forum subject to strict scrutiny review. Then, the district court determined the challenged portion of the first paragraph of the Plaza Order failed strict scrutiny review and that the remaining preliminary injunction factors favored Plaintiffs-Appellees. Thus, the district court enjoined the portion of the first paragraph of the Plaza Order as it pertained to Plaintiffs-Appellees' jury nullification advocacy.

By the time the district court was asked to address whether a permanent injunction should issue, nothing of factual significance had changed since the preliminary injunction hearing. This is true despite Denver's now siding with the Second Judicial District and its de-designation of the restricted area of the Plaza. Although Denver purported to change its position and to de-designate the restricted

17

area as a public forum, Denver also asserted that it did not intend to alter its previous stipulation presented at the preliminary injunction hearing, stating "the decision to de-designate is prospective only." Id. at 686. Thus, as regard the preliminary injunction, Denver's position had not changed. See id. at 757–58 ("Denver's choice not to withdraw from the Stipulation means that the Courthouse Plaza remains a designated public forum as it relates to Denver's ability to impose restrictions on the property." (emphasis omitted)).

Indeed, we agree with the district court's determination that "all of the parties remain[ed] in functionally the same position as they were during the preliminary injunction proceedings." Id. at 754. At the preliminary injunction stage of litigation, Denver stipulated the restricted area of the Plaza was a public forum. Denver's stipulation did not bind the Second Judicial District, and the Second Judicial District claimed the restricted area was a nonpublic forum. At the permanent injunction stage, Denver continued to be bound by its stipulation, this stipulation still did not bind the Second Judicial District, and the Second Judicial District again argued the restricted area was a nonpublic forum.

Thus, what led to the district court's "dissolution" of the preliminary injunction was not a variation in the factual context of the case, but rather the district court's changed view of the role of Denver's stipulation. When determining whether a permanent injunction should issue, the district court did not assume that Denver's stipulation affected the Second Judicial District's designation of the restricted area and accept it as controlling. Instead, the district court concluded "that Denver's

18

Stipulation does not bind the Second Judicial District." Id. at 758. Rather, "[t]he Courthouse Plaza is . . . governed by what may be deemed 'separate sovereigns,'" where "Denver is the landowner, but the Second Judicial District is a tenant with inherent authority to issue orders for preservation of security and decorum." Id. at 757. Thus, at the permanent injunction stage, the district court ruled that both parties had interests in the Plaza as well as the ability to designate its status.

The Second Judicial District and Plaintiffs-Appellees' designation of the Plaza continued to be diametrically opposed, with the Second Judicial District arguing the restricted area was not a public forum and Plaintiffs-Appellees arguing that it was. Traditionally, courthouse grounds have not been considered public fora, as this category is typically reserved for public: (1) parks, (2) streets, and (3) sidewalks, which we noted in Verlo I. See 820 F.3d at 1138; see also Frisby v. Schultz, 487 U.S. 474, 480–81 (1988). Relying on this and on its own analysis of precedent, the district court held—independent of Denver's stipulation—that the restricted area of the Plaza was not a public forum. See App., at 804 ("[A]pparently *every* court to address the issue has held that the grounds of a courthouse (apart from surrounding public sidewalks) are *not* a traditional public forum."). Based on this conclusion, the court "dissolved" the preliminary injunction.

Also relevant is the fact that the district court itself has now twice all but admitted that it erred in entering the preliminary injunction. In its order "dissolving" the preliminary injunction, the district court noted, "if the preliminary injunction hearing had been framed in these terms"—that Denver's stipulation with Plaintiffs-

19

Appellees did not bind the Second Judicial District—"the result might have been different" because "courthouse grounds are routinely deemed to be nonpublic fora." Id. at 758. In its recent order granting in part and denying in part Plaintiffs-Appellees' fee motion, too, the district court noted that "it was probably incorrect at the preliminary injunction phase to find that Plaintiffs were likely to succeed on the merits in proving that Denver had the final say about the Courthouse Plaza, because neither Denver nor the Second Judicial District has the final say. Each is a 'separate sovereign' over the same territory." D. Ct. Dkt. 203, at 9.

When ruling upon the motion for the preliminary injunction, the district court did not determine the correct course of action after considering the views of two different defendants with interests in the restricted area. Instead, the district court entered the preliminary injunction based on an incorrect assumption. This scenario fits United Mine Workers' and Reliance I's directive that "the right to . . . remedial relief for violation of an injunction or temporary restraining order falls with an injunction or temporary restraining order 'which events prove was erroneously issued.'" Reliance I, 84 F.3d at 376 (quoting United Mine Workers, 330 U.S. at 295) (emphasis added). Therefore, Plaintiffs-Appellees' right to remedial relief for Denver's alleged violation of the preliminary injunction evaporated with the "dissolution"—or, more properly labeled, "reversal"—of the injunction. See Ager v. Jane C. Stormont Hosp. and Training Sch. for Nurses, 622 F.2d 496, 500 (10th Cir. 1980) ("[T]he viability of the contempt citation depends upon the validity of the underlying order.").

20

## IV

We thus REVERSE the district court's order finding Denver in contempt of its previously issued preliminary injunction.

Entered for the Court


Mary Beck Briscoe
Circuit Judge